# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

HEATHER M. ANDERSON and
DUSTIN M. WICHMANN,

               Plaintiffs,

     v.                                          Case No. 09-CV-840

CITY OF WEST BEND POLICE DEPARTMENT,
COMMUNITY INSURANCE CORPORATION,
RUSSELL PETRANECH and STEVEN WELLNER,

               Defendants.

_____

# ORDER

On July 31, 2009, plaintiffs Heather M. Anderson ("Anderson") and Dustin M. Wichmann ("Wichmann") filed a complaint in the Washington County Circuit Court. In their complaint, plaintiffs allege the violation of their Fourth Amendment rights pursuant to 42 U.S.C. § 1983 and the violation of their privacy rights under Wisconsin law by virtue of a warrantless home entry and the fact and manner of their arrests by defendants City of West Bend Police Department ("Police Department"), Community Insurance Corporation ("Community Insurance"), Russell Petranech ("Officer Petranech"), and Steven Wellner ("Officer Wellner"). On September 1, 2009, the defendants removed this action to the U.S. District Court for the Eastern District of Wisconsin. (Docket #1). The defendants allege that jurisdiction lies under 28 U.S.C. §§ 1331 and 1334. (Notice of Removal ¶ 5).

On June 1, 2010, the defendants filed a motion for summary judgment. (Docket #18). Subsequently, on June 30, 2010, the plaintiffs filed a motion to amend

the summons and complaint. (Docket #'s 36, 38).[1] After carefully considering the parties' submissions regarding the plaintiffs' claims, as well as the plaintiffs' motion to amend the complaint, the court will grant in part and deny in part plaintiffs' motion to amend and the court will grant in full defendants' motion for summary judgment.

## BACKGROUND

In July of 2008, plaintiffs Anderson and Wichmann lived together in a second floor apartment located in West Bend, Wisconsin.[2] In the early morning of July 13, 2008, Wichmann returned home from the bar and a verbal altercation between the couple ensued. After the couple went to bed and later awoke on July 13, 2008, the argument continued and escalated. At some point, Wichmann and Anderson went out to the balcony of their second-floor apartment to have a cigarette and continue their fight. Anderson soon began crying, then Wichmann returned inside the apartment and locked Anderson out, leaving her screaming. Eventually, Wichmann unlocked the balcony door and let Anderson back into the apartment. Once back inside, the two continued arguing. The parties all agree that the argument was sufficiently loud for the neighbors to hear. In fact, one neighbor called 911 to report the disturbance. The neighbor later reported to law enforcement that though he had

---

[1]Plaintiffs filed what appear to be two identical motions to amend the summons and complaint.

[2]Unless otherwise noted, the court takes these undisputed facts from the Defendants' Reply to Plaintiffs' Joint Response to Defendants' Proposed Findings of Fact and Response to Plaintiffs' Additional Facts. (Docket #46).

heard the couple argue before, this time he heard what sounded like furniture moving, things banging around, and a female voice saying: "Help me, help me."

In response to the 911 call, Officer Wellner and Officer Petranech arrived at the scene and proceeded to knock on the side common door of the apartment complex. Anderson eventually responded to the officers' knocks downstairs. She had "obviously been crying" and appeared very upset. Anderson opened the door to the officers. They asked her to step outside and indicated they needed to make sure she was okay. Anderson refused their request, stated she did not need help, said she was "fine," retreated, closed the door and locked it against the officers.

The parties disagree over whether Anderson told Officers Petranech and Wellner that she would be "right back" before locking the door and retreating to the apartment. The officers recall Anderson making a comment of this sort. (Ford Aff., Exs. C, D [Wellner Dep.157:13-17; Petranech Dep.16:19-24]) (Docket #26). Anderson does not deny promising the officers she would return or asking them to "hold on"; however, she does not confirm she said those words either. Instead, Anderson testified as follows:

> Q: Did you tell [the officers] that you were not going to come outside?
>
> A: I believe I said something – that I was fine and I didn't need to talk to them any further or something to that effect.
>
> Q: And then you shut the door and locked it against the police officers?

A:      I told them – I believe I told them something about having to put
        out my cigarette because there was lots of smoke in  the hall.

Q:      And you shut the door and locked it against the police officers?

A:      Yes.

(Ford Aff., Ex. A [Anderson Dep. 113:25, 114:1-12]). Though the plaintiffs attempt to create a factual dispute based on this testimony, the court finds that the reasonable inferences drawn from the above evidence suggest that Anderson's comments, whatever they actually were, left the officers with the impression that she would likely be returning to speak with them after she locked the door. It is undisputed that Anderson never returned to the door.

The lower unit tenant of the apartment complex, Gustave Witte, unlocked the side door for the officers, which led into a common hallway. The officers then climbed the stairs to the plaintiffs' apartment, announced themselves, and began knocking on the door. The officers knocked on the door and announced themselves repeatedly. At some point, Officer Petranech spoke to Lieutenant Vetter, his supervisor, who had also responded to the domestic abuse call. Lieutenant Vetter was advised of what the other two officers had observed with regard to Anderson's distraught appearance and failure to reappear to the side door, as she implied she would. Lieutenant Vetter then went to speak to witnesses and the officers set up a perimeter on the stairway to await the results of the investigation. It is agreed that the officers continued in their attempts to make contact with the plaintiffs for approximately twenty to twenty-five minutes.  During this time period, Officer Wellner

heard noise from within the apartment that led him to believe that individuals were inside the unit. Officer Petranech heard what he believed to be a television set turn on. Lieutenant Vetter soon returned and reported what he had learned from witnesses, including the report that the 911 caller heard a female voice say "help me" as well as banging sounds and furniture moving. Shortly before Lieutenant Vetter ordered a warrantless entry into the apartment, Wichmann called the dispatcher at the West Bend Police Department inquiring as to why there were police officers knocking on his door.

Officer Wellner broke down the interior apartment door. Upon entry into the apartment, the officers conducted a sweep of the unit with their weapons drawn, eventually finding both plaintiffs in the shower. Anderson believes she was initially hidden from the officers by the shower curtain and was not observed until after Wichmann was out of the shower and on the ground.  Both plaintiffs were ordered out of the shower and onto the ground. The plaintiffs initially refused the requests because they were naked. The parties do not dispute that after Wichmann's refusal to voluntarily step out of the shower, Officer Petranech grabbed him, threw him over his leg in a takedown maneuver, causing Wichmann to hit his face against the floor.

Anderson grabbed a bath mat to cover the front of her body when she stepped out of the shower. Officer Petranech admits to pointing his weapon at where he believed Anderson's body would be, after she poked her head out from behind the shower curtain. He kept it pointed at her while repeatedly ordering her out of the

shower. Once Anderson was out of the shower, Officer Petranech handcuffed Wichmann, applying pressure with his knee to Wichmann's arm and back. Wichmann claims the pressure from the handcuffs "messed up" his wrists. (Wichmann Dep. 81:19-25). The parties do not dispute that Officer Petranech dragged Wichmann about 8 to 10 feet, while he was still on the floor, into the adjacent kitchen where Officer Wellner took custody of the plaintiff and escorted him to the bedroom. Wichmann received a burn on his hip from the friction between his body and the floor. While in the bedroom, Wichmann was assisted in putting on shorts and the handcuffs were temporarily removed to allow him to put a shirt on before leaving the apartment.

Officer Petranech also handcuffed Anderson and took her into another room to be dressed. Officer Petranech assisted Anderson in getting dressed while she was still handcuffed, all the while allowing her to keep the bath mat covering the front portion of her body. Once her shorts were halfway up, Officer Petranech removed her handcuffs from one arm and allowed Anderson to finish putting on her shorts. Anderson was not re-cuffed until she finished dressing. The parties do not dispute that Anderson was denied requests for a female officer in front of which she could change. Anderson also objected to having only Officer Petranech in the room while she changed and, therefore, Officer Wellner came into the room as well. (Anderson Dep. 233:11-18). Once she was fully clothed, the officers searched Anderson. Anderson contends this search was unreasonable as the officers had already picked

out her clothes and, thus, had no reason to search her person. Plaintiffs received a municipal citation for disorderly conduct, without a domestic abuse enhancer, as a result of this incident.

## DISCUSSION

### I.   Motion to Amend

The court finds it most expedient to first address the plaintiffs' motion to amend the complaint as its resolution affects the court's disposition on summary judgment. The plaintiffs request leave to amend the complaint in four ways. First, in recognition that the Police Department is not a suable entity under § 1983, the plaintiffs request an amendment changing the municipal defendant from the Police Department to the City of West Bend. Second, the plaintiffs seek amendment of the complaint to clarify that Officers Petranech and Wellner are being sued in their individual capacities rather than their official capacities. Next, the plaintiffs seek permission to add a party defendant, Lieutenant James Vetter, Jr. ("Lieutenant Vetter"), claiming that development of the factual record indicated Lieutenant Vetter was more involved in the actions giving rise to the claims than was at first apparent when the suit was commenced. Lastly, the plaintiffs also state that their amended complaint would drop the state law privacy claim. (Pl. Anderson Resp. Br. to Defs.' Mot. Summ. J. 13).

In considering whether to allow plaintiffs to amend their complaint, the court is guided by the premise that leave to amend shall be freely given "when justice so

requires." Fed. R. Civ. P. 15(a).  A district court has wide discretion to decide whether to grant a  motion to amend a pleading before trial pursuant to Rule 15(a).[3] However, when a plaintiff seeks to amend its pleading after expiration of the trial court's Scheduling Order deadline, as Anderson and Wichmann seek to do here, the plaintiff must show "good cause." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.,* 424 F.3d 542, 553 (7th Cir. 2005) (citing Fed. R. Civ. P. 16(b)).  The court primarily considers the "diligence of the party seeking amendment" in making a "good cause" determination. *Id.*  If the moving party was not diligent, the inquiry ends. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Moreover, a party generally must offer an explanation – such as excusable neglect – for why it did not seek amendment sooner. Fed. R. Civ. P. 6(b)(1)(B).  Courts may deny leave to amend under Rule 15(a) if there is an apparent or declared reason for doing so, such as "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" *Liu v. T & H Machine*, 191 F.3d 790, 794 (7th Cir. 1999) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

On the other hand, in some circumstances, amendments to a pleading will relate back to the date of the original pleading.  Rule 15(c) sets forth an exclusive list

---

[3]Following an initial period after filing a pleading during which a party may amend once "as a matter of course," "a party may amend its pleading only with the opposing party's written consent or the court's leave," which the court "should freely give ... when justice so requires." Fed. R. Civ. P. 15(a)(1)-(2).

of requirements for relation back and mandates relation back once its requirements are satisfied. *Krupski v. Costa Crociere S.P.A.*, 130 S.Ct. 2485, 2496 (2010). Unlike Rule 15(a), Rule15(c) "does not leave the decision whether to grant relation back to the district court's equitable discretion." *Id.* (citing Rule 15(c)(1) ("An amendment ... relates back ... when" the three listed requirements are met)).

At issue here is the third requirement under Rule 15(c)(1)(C) which provides that relation back occurs when:

> the amendment changes the party or the naming of the party against whom a claim is asserted [if the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading], and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (I) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

The United States Supreme Court recently clarified in *Krupski v. Costa Crociere S.P.A.*, 130 S.Ct. 2485 (2010), that relation back of an amended pleading to the date of the timely filed original pleading depends on what the party to be added knew or should have known, not on the amending party's knowledge or timeliness in seeking to amend the pleading. *See* Fed. R. Civ. P. 15(c). Rule 15(c)(1)(C) permits the court to examine a plaintiff's conduct during the Rule 4(m) period, but only to the extent the plaintiff's post-filing conduct informs the defendant's

understanding of whether the plaintiff made a mistake concerning the proper party's identity. *Krupski*, 130 S.Ct. at 2496.

Here, it appears that the first amendment sought by plaintiffs, changing the name of defendant Police Department to the City of West Bend ("the City"), meets the requirements of Rule 15(c)(1)(C). First, the amendment will assert an identical claim, just against a different party. Next, the original summons and complaint were served upon the City Clerk, so the City received notice of the action and will not be prejudiced in defending on the merits. Indeed, it appears that the City has been involved in the defendants' submissions to the court from the beginning of this matter. Furthermore, the City knew or should have known that the action would have been brought against it, but for the plaintiffs' mistake concerning the proper party's identity. The plaintiffs clearly mistook the Police Department as the appropriate entity to sue, as it is unlikely any rational plaintiff would commence an action against an unsuable entity if he or she knew as much. Additionally, the City knew of the mistake because, in its answer, the City lists as an affirmative defense that the Police Department is not a suable entity. (Answer, Affirmative Defenses ¶ 21) (Docket #1). Furthermore, the plaintiffs also named Community Insurance as a defendant. Community Insurance is the insurer for the City. (Pl. Anderson's Resp. Br. to Defs.' Mot. Summ. J. 14). The Seventh Circuit has also indicated that Rule 15(c) provides for relation back only as "a means for correcting the mistakes of plaintiffs suing official bodies in determining which party is the proper defendant."

*Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 560 (7th Cir. 1996) (citing Advisory Committee Note to the 1966 Amendment to Rule 15(c)). Therefore, the circumstances of this case are exactly what the Rule envisioned for relation back of an amendment. Accordingly, relation back of this proposed amendment is mandatory.

As for the plaintiffs' attempt to amend their complaint to reflect that the officers are being sued in their individual capacities, the court notes that a mistake concerning whether to sue a defendant in his official capacity or his individual capacity falls within the purview of Rule 15(c) because it is effectively the same as a change in party. *See Hill v. Shelander*, 924 F.2d 1370, 1376 (7th Cir. 1991). Although it does appear that the requirements of Rule 15(c) are met with regard to the relation back of the plaintiffs' amendment in this respect, even without the amendment, the court would have opted to treat the suit as against the defendant officers in their individual capacities because the complaint seeks punitive damages – a remedy only available in an individual capacity suit – and because "'the unconstitutional conduct alleged involve[d] [the defendants'] individual actions and nowhere allude[d] to an official policy or custom.'" *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000) (quoting *Hill*, 924 F.2d at 1374). Indeed, the plaintiffs admit that "there are no allegations of a constitutional violation of an express policy, widespread practice/custom, or a decision made by a person with final policy-making authority." (Pl. Anderson's Resp. Br. 13; Pl. Wichmann's Resp. Br. 26). As allegations of a

policy, custom, or decision by a final policy-making authority are required to hold a municipality liable under § 1983, it is apparent that plaintiffs' claims are against the defendants in their individual capacity, rather than their official capacity. Therefore, the court will grant the plaintiffs' amendment seeking to clarify that Officer Petranech and Officer Wellner are being sued in their individual capacities. The court will conduct its summary judgment determination accordingly.

Next, the plaintiffs seek to add Lieutenant Vetter as a defendant, arguing that development of the record revealed he was more involved in the incidences giving rise to the alleged civil rights violations than was at first thought when plaintiffs served the complaint. First, the court is not convinced that Rule 15(c) is meant to correct pleading errors of this nature because failure to name Lieutenant Vetter as a party appears not to be the type of mistake envisioned by the rule. In the court's opinion, lack of knowledge by the plaintiffs is not commensurate with a mistake under Rule 15(c). However, even if Rule 15(c) is applicable here, the submissions to the court do not indicate that Lieutenant Vetter received notice of the action within the applicable limitations period so as to not be prejudiced in defending on the merits. Furthermore, the submissions to the court do not demonstrate that Lieutenant Vetter knew or should have known the action would have been brought against him but for an error by the plaintiff. Although Lieutenant Vetter ordered the other two officers to enter the apartment and spoke with witnesses about the events precipitating the 911 call that brought Officer Petranech and Officer Wellner to the

apartment, this does not necessarily mean that Lieutenant Vetter should have known he was meant to be named as a defendant in this action. Therefore, the court finds that an amendment adding Lieutenant Vetter as a defendant does not relate back to the original pleading. Because this means the amendment will be dated after expiration of the trial court's Scheduling Order deadline, the plaintiffs must demonstrate good cause for the amendment and the court, if circumstances so require, may deny the amendment based on its equitable discretion.

In this case, the court finds that the amendment would result in undue delay and unfair prejudice and that the moving parties have failed to act with diligence by filing the motion to amend approximately seven and a half months after the self-imposed deadline for amending the pleadings, approximately two and a half months after an initial discovery deadline, approximately one month after an extended discovery deadline, and one month after the defendants filed a motion for summary judgment. *See Sanders v. Venture Stores,* Inc., 56 F.3d 771, 774 (7th Cir. 1995) (finding that Seventh Circuit "case law uniformly advis[es] that a plaintiff's leave to amend, when filed after discovery has been closed and after a defendant's motion for summary judgment has been filed, is considered unduly delayed and prejudicial."); *see also Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir. 1999) (finding that plaintiff's motion would cause undue delay to the nonmoving party when it was filed six months after the close of discovery and five months after the discovery of allegedly new facts that required the amendment).

In fact, plaintiffs' explanation for their delay in seeking amendment – that they lacked full knowledge of Lieutenant Vetter's involvement – is contradicted by the record. The record demonstrates that plaintiffs had knowledge of Lieutenant Vetter's involvement in the incidences giving rise to plaintiffs' claims well before filing their motion to amend the complaint – as early as November 2009. For example, the plaintiffs' Rule 26 Initial Disclosures, received by defendants in November of 2009, included reference to and a copy of the police report detailing the events that transpired at the apartment. (7/13/10 Ford Aff., Exs. J, K) (Docket #'s 41-1, 41-2). The report indicates Lieutenant Vetter spoke with witnesses and the 911 caller about the events precipitating the emergency call and that Lieutenant Vetter ordered entry into the apartment. (*Id.*). Furthermore, adding Lieutenant Vetter at this late juncture would be prejudicial because it may subject the defendant to new discovery, and the current defendants have already exhausted considerable time and resources in defending this action based on the original complaint and the original defendants. Accordingly, the court will deny plaintiffs' request to amend the pleadings adding Lieutenant Vetter as a defendant. Lastly, the court will grant plaintiffs' request to amend the complaint to eliminate the state law privacy claim. With the above rulings in mind, the court will now consider the defendants' motion for summary judgment.

## II. Legal Standard of Review for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the nonmoving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.* 554 F.3d 1133,

1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)).

Once the movant satisfies this initial burden, the burden then shifts to the nonmoving

party who "may not rest upon the mere allegations or denials of his pleading, but . . .

must set forth specific facts showing that there is a genuine issue for trial." *Doe v.*

*Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

There is no issue for trial unless the nonmoving party demonstrates that there is

*sufficient evidence* in the nonmoving party's favor for a jury to return a verdict for that

party. *Anderson*, 477 U.S. at 249. If the evidence is "merely colorable" or is "not

significantly probative," summary judgment may be granted. *Id.* Consequently, the

nonmoving party must do more than raise some doubt as to the existence of a fact.

In ruling on a summary judgment motion, the court must view the evidence plus all

inferences reasonably drawn from the evidence in the light most favorable to the

non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d

625, 630 (7th Cir. 2007).

## III.    Analysis

As an initial matter, the court will dismiss the plaintiffs' claims against the City.

In order to maintain a civil rights action against a municipality, plaintiffs must

establish that a municipal policy, custom or practice or a decision by a person with

final decision-making authority caused their injuries. *See Board of County Comm'rs*

*v. Brown*, 520 U.S. 397 (1997). The plaintiffs concede they allege no municipal

policy, custom or decision by a person with final policy-making authority that caused

the plaintiffs' purported injuries. (Pl. Anderson's Resp. Br. 13; Pl. Wichmann's Resp. Br. 26). Moreover, the court finds no evidence in the record suggesting that plaintiffs state a claim against the municipality for civil rights violations. Accordingly, the defendants are entitled to summary judgment as to any claims against the City.

The plaintiffs set forth several distinct Fourth Amendment claims against the individual officers. First, they argue the officers unlawfully entered the apartment. Second, both plaintiffs allege their arrests were unlawful because they were effectuated without a warrant and did not fall within any exceptions to the warrant requirement. Next, Anderson contends the officers conducted an unlawful search of her person. Lastly, the plaintiffs claim their arrests were unlawful due to the officers' use of excessive force. The officers have asserted qualified immunity as an affirmative defense to all of plaintiffs' claims. The court will discuss each claim in turn.

### A.    Warrantless Entry

The Fourth Amendment protects individuals from all unreasonable searches and seizures and "has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980). Absent probable cause and exigent circumstances, "that threshold may not reasonably be crossed without a warrant." *Id.* The exigent circumstances doctrine recognizes that a warrantless entry by law enforcement officials "'may be legal when there is compelling need for official action

and no time to secure a warrant.'" *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)).

Exigent circumstances exist where "there is a reasonable belief by police that their safety or the safety of others may be threatened." *United States v. Ware*, 914 F.2d 997, 1000-01 (7th Cir. 1990). Moreover, the Fourth Amendment does not proscribe "police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). The "reasonable belief" standard is objective, and requires evidence demonstrating that the "'circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.'" *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000) (quoting *United States v. Arch*, 7 F.3d 1300, 1303-05 (7th Cir. 1993)).

### 1.    Exigent Circumstances

In this case, exigent circumstances justified the warrantless entry. The court recognizes that "granting unfettered permission to officers to enter homes, based only upon a general assumption domestic calls are always dangerous, would violate the Fourth Amendment." *United States v. Davis*, 290 F.3d 1239, 1244 (10th Cir. 2002). Yet, when specific facts suggest a crime of domestic violence has been committed, that a threat of domestic violence still exists, or that a possible domestic abuse victim may be injured and in need of immediate aid, there may be grounds for

a warrantless home entry. The court concludes that this is such a case. The initial 911 call, the reports from a neighbor of calls for help and sounds of a physical altercation, the distraught state of Anderson when she first spoke with the officers, and the fact that Wichmann was in the apartment when Anderson returned inside the apartment and locked the door, all gave officers reason to believe that Anderson may have been in need of immediate assistance due to a domestic disturbance.[4]

The plaintiffs argue that the police officers, once having spoken with Anderson, were able to determine she was unharmed and, therefore, the exigency dissipated. However, statements from a potential domestic abuse victim that she is unharmed do not automatically terminate the need for further inquiry by the police. *Hanson v. Wisconsin*, – F.3d – , 2010 WL 2365455, *1 (7th Cir. June 15, 2010)*; see United States v. Brooks*, 367 F.3d 1128, 1137 (9th Cir. 2004). It is not uncommon for victims of domestic violence to deny an assault, especially when an abuser is present. *Brooks*, 367 F.3d at 1137.[5] In fact, many domestic violence victims fear

---

[4]As the court previously noted, the plaintiff attempts to dispute that Anderson promised the officers she would return to the door after locking it. However, Anderson's deposition testimony tends to show that her statements to police suggested she would return to the door. Thus, assuming the officers were under the impression Anderson would return, they had even more reason to believe she was in need of immediate assistance when she never returned and no one responded to their knocking. On the other hand, if the court assumes Anderson never promised she would return to the door or that the officers had no reason to believe she would return, the court finds that the other underlying facts still supply the necessary basis for the officers to enter the apartment.

[5]Though Wichmann was not physically present when Anderson first spoke with police, the police had reason to believe that Wichmann was in the apartment. Anderson's reluctance to step outside, her retreat into the apartment, and her locking of the door could lead a reasonable law enforcement official to believe Anderson had been threatened or feared retaliation should she speak more freely with the officers.

they will face increased danger if they assist or cooperate with police or prosecutors. *Hanson*, 2010 WL 2365455 at * 1 (citing Eve S. Buzawa & Carl G. Buzawa, *Domestic Violence: The Criminal Justice Response* 177-89 (3d ed. 2002)); *see, e.g.*, Rhonda L. Kohler, *The Battered Women and Tort Law: A New Approach to Fighting Domestic Violence*, 25 Loy. L.A. L.Rev. 1025, 1026-27 (1992) ("Many women do not report instances of abuse because they are afraid to call the police or seek assistance out of cultural, family or religious pressure, fear of retaliation, or lack of protection by the police. Some women do not even identify themselves as being battered."); *Fletcher v. Town of Clinton*, 196 F.3d 41, 52 (1st Cir. 1999) ("In domestic violence situations, officers may reasonably consider whether the victim [in denying she or he is in danger] is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes."); *United States v. Lawrence*, 236 F.Supp.2d 953, 963 (D.Neb. 2002) ("Even when the possible victim of domestic abuse assures the officer that she is in no danger, an officer is entitled to consider all the facts and is not required to take her statement at face value in assessing the potential threat of physical harm.").

Therefore, Anderson's statements to the police that she was "fine" and the fact that she did not appear to be physically injured did not necessitate an end to the officers' inquiry of the situation, especially in light of the other facts. Indeed, Anderson's statement that she was "fine" was contradicted both by her distraught appearance and the statement from a neighbor indicating that a woman within the

apartment yelled out "help me." Given these facts, it was reasonable for the officers to believe, even despite her comment of being "fine," and no sign of physical injury, that Anderson had been threatened or feared retaliation should she give the police more information regarding the nature of the dispute with Wichmann. When Anderson returned inside the apartment and locked the door and no one answered to the subsequent knocking by Officer Petranech and Officer Wellner for approximately twenty to twenty-five minutes, it was also reasonable for the police to believe, in light of all the other circumstances, that Anderson was in need of immediate assistance and that the danger of domestic violence had not passed.

Further supporting the officers' warrantless entry is their awareness that Wichmann was in the apartment with Anderson during this period of time. In those domestic violence cases where courts have found exigent circumstances, law enforcement officers were presented with "clear evidence that the victim was both still in the vicinity of the abuser and still in danger." *See United States v. Black*, 466 F.3d 1143, 1447-48 (9th Cir. 2006) (Berzon, J., dissenting) (collecting cases for this proposition). In this case, shortly before the officers entered the apartment, they were alerted by the dispatcher that Wichmann had called the dispatcher, inquiring into why the police were "pounding on his door." (Pl. Anderson's Resp. Br. 4). When knocking on the door, the officers also heard voices and a television set turned up, confirming that people were inside the apartment. Therefore, the officers were reasonable to conclude that both Wichmann and Anderson were in the apartment.

Based on the other facts previously discussed, the officers were also reasonable to believe that Anderson was still in danger.

Wichmann, who gave his phone number to the dispatcher, argues that the police should have called him and discussed the situation over the phone rather than enter the apartment without a search or arrest warrant. However, the Supreme Court has consistently refused to hold that only the "'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995) (quoting *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 629 n. 9 (1989) (collecting cases for this proposition)). Though police may have attempted to call Wichmann to interview him and assess the situation, this was not constitutionally required. A telephone interview with the potential aggressor would not necessarily have been effective to protect Anderson in this context because it would not have sufficiently addressed the exigency of the situation faced.

The plaintiffs also argue that during the approximately twenty to twenty-five minutes between when officers spoke with Anderson at the apartment's outer door and when the officers entered the actual apartment, the officers did not observe any evidence of violence or a medical emergency that warranted entry. Though this is true, the court rejects the notion that the exigency dissipated based on this premise. An exigency does not evaporate simply because the police defer their entry while making an effort to confirm or deny their suspicions or while taking reasonable

precautionary measures to reduce the risk of serious injury to themselves or others. *United States v. Jones*, 635 F.2d 1357, 1362 (8th Cir. 1980); *United States v. Salava*, 978 F.2d 320, 324 (7th Cir. 1992). During the lag in time between the officers' discussion with Anderson and their entry into the apartment, Lieutenant Vetter, who had also arrived at the scene, went to speak with witnesses. During his brief investigation, Lieutenant Vetter learned from a neighbor – the 911 caller – that the neighbor had heard a female voice say "help me, help me" and he heard what sounded like furniture moving and things banging around. (Ford Aff., Ex. E [Petranech Report at 2-3] and Ex. D [Petranech Dep. 70-71]). Therefore, though the officers may not have observed any evidence of violence or other type of emergency during this time period, the other facts known to them and gathered during this lull in time provided the officers with the objectively reasonable belief that Anderson's safety was threatened and the situation was sufficiently exigent as to justify entry without a warrant.

The plaintiffs further contend that an exigency did not exist permitting lawful entry of the apartment or justifying the subsequent warrantless arrests because, at most, the officers only had probable cause to believe that Anderson and Wichmann had disturbed the peace, a relatively minor offense. Plaintiffs cite *Welsh v. Wisconsin*, 466 U.S. 740 (1984), as support for this argument. In *Welsh*, the Supreme Court held that an important factor to be considered when determining whether an exigency exists justifying a warrantless home entry is the gravity of the

underlying offense for which the arrest or the entry is being made. *Id.* at 753. The Court further stated that "no exigency is created simply because there is probable cause to believe that a serious crime has been committed" and that the exigent circumstances exception in the context of a home entry "should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id.* In *Welsh*, the police entered a house without a warrant to arrest Welsh for drunken driving, which, on first offense, was a noncriminal violation, punishable by a maximum fine of $200. *Id.* at 746. The Court found this offense was of such a minor nature that it did not justify the officers' warrantless entry of the private residence and subsequent warrantless arrest, even if sufficiently exigent circumstances had existed. *Id.* at 754. The only exigent circumstance proffered by the officers was that the arrestee's blood alcohol level would dissipate during the delay required to obtain a warrant. *Id.* at 753. *Welsh* casts serious doubt on the question of whether a warrantless home arrest for a misdemeanor will ever be deemed reasonable. On the other hand, the Court refrained from flatly holding that no warrantless home arrest could occur for a misdemeanor. The Seventh Circuit has held that "at a minimum, exigent circumstances do not exist when the underlying offense is minor, typically a misdemeanor." *Reardon v. Wroan,* 811 F.2d 1025, 1028 (7th Cir. 1987).

Plaintiffs' reliance on *Welsh* is based on their contention that the only probable cause the officers had to enter the home and arrest without a warrant was for

disorderly conduct – a misdemeanor. However, as the court will subsequently discuss, the police had probable cause to believe Wichmann had engaged in or was engaging in domestic abuse. Under the facts of this case, the court finds the crime of domestic abuse to be sufficiently grave to enter the plaintiffs' private residence without a warrant. This conclusion is supported not only by the facts of this case but also by the recognition that domestic violence is an inherently dangerous offense, one that can lead to death. Though the plaintiffs have a strong privacy interest in their home, it was outweighed in this instance by the risk that delaying entry would engender injury. Accordingly, taking into account the severity of the underlying offense for which the entry was being made, as well as the undisputed facts of this case, the court finds the warrantless home entry was supported by exigent circumstances because it was reasonable for the officers to believe that Anderson was in need of immediate assistance.

### 2. Probable Cause

Here, the police were warranted in entering the plaintiffs' apartment without a warrant not only due to the exigency of the situation but also because the officers had probable cause to believe that domestic abuse had been committed or was being committed within the apartment. The police have probable cause to arrest an individual when "the facts and circumstances within their knowledge and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense."

*Maxwell v. City of Indianapolis*, 998 F.2d 431, 433 (7th Cir. 1993). Probable cause "does not mean certainty, or even more likely than not, that a crime has been committed" but it does require more than a mere suspicion. *Hanson,* 2010 WL 2365455 at *1 (citing *Illinois v. Gates*, 462 U.S. 213, 235 (1983)); *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990).

The elements for domestic abuse pursuant to Wis. Stat. § 968.075 are: (1) intentional infliction of physical pain, physical injury or illness; (2) intentional impairment of physical condition; (3) a violation of Wis. Stat. § 940.225 for sexual assault; or (4) a physical act that may cause the other person reasonably to fear imminent engagement in the conduct described in (1), (2), or (3). Furthermore, under Wis. Stat. § 968.075, the officer shall arrest and take a person into custody if the officer has a reasonable basis for believing that one is committing or has committed domestic abuse and either the officer has a reasonable basis for believing there will be continued domestic abuse or there is evidence of physical injury to the alleged victim.[6]

The undisputed facts show that defendants had probable cause to believe that plaintiff Wichmann had violated Wis. Stat. § 968.075. At the time defendants made the entry and the arrest, they knew that: (1) a 911 call had been made by a neighbor

---

[6] Wisconsin's domestic abuse statute is contained not in the state's Criminal Code, but rather the Criminal Procedure chapter of statutes. Thus, the statute itself provides policies and procedures for handling incidents falling within the purview of the statute. Wis. Stat. § 968.075. Because this statute does not independently impose criminal penalties, the plaintiffs argue it cannot provide a basis for a warrantless entry. However, in *Hanson v. Wisconsin*, 2010 WL 2365455, the Seventh Circuit confirmed that a suspected violation of Wis. Stat. § 968.075 may provide law enforcement with probable cause to enter a residence.

reporting a domestic disturbance between a man and a woman at the apartment in question; (2) a woman had been heard yelling "help me" from within the apartment; (3) loud banging had been heard; (4) plaintiff Anderson had appeared upset when defendants spoke with her; (5) the officers were under the impression that Anderson would return to the door, but she never returned; and (6) plaintiff Anderson was within the residence with Wichmann and neither had responded to the officers' knocking. A common sense viewing of these undisputed facts would lead a reasonable law enforcement officer to conclude that plaintiff had committed domestic abuse under Wis. Stat. § 968.075 by finding that Wichmann had intentionally inflicted physical pain or physical injury on Anderson, or had engaged in a physical act that may have reasonably caused Anderson to fear imminent engagement of intentional infliction of physical pain or physical injury.[7]

### B.    Warrantless Arrests

The court has already discussed that the officers had probable cause to enter the plaintiffs' home based on the reasonable belief that Wichmann had engaged in domestic abuse. The same probable cause analysis justifies Wichmann's warrantless home arrest.

-----

[7] The court notes that it makes little difference that Wichmann was ultimately not charged with domestic abuse, but only with disorderly conduct. So long as the officers had any probable cause to make the arrest, Wichmann is precluded from a false arrest claim under § 1983. *See Devenpeck v. Alford,* 543 U.S. 146, 153 (2004); *see also Morfin v. City of E. Chicago*, 349 F.3d 989, 997 (7th Cir. 2003).

Next, the court turns to the question of whether the officers had probable cause to arrest Anderson without a warrant inside her home. First, it should be noted that since the court has determined the police were lawfully on the premises, they were also permitted to take any further action that was supported by probable cause. *See Georgia v. Randolph*, 547 U.S. 103, 118 (2006) ("since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause") (citing *Texas v. Brown*, 460 U.S. 730, 737-39 (1983)); *see also Sheik-Abdi v. McClellan,* 37 F.3d 1240,1245 (7th Cir. 1994) ("Once the veil of the home has been legally pierced, we see no need for police officers to turn a blind eye to crime, so long as the arrest is otherwise effected in compliance with the constitutional requirement of probable cause.").

The defendants seem to argue that the officers had probable cause to believe that *both* plaintiffs had engaged in domestic abuse in violation of Wis. Stat. § 968.075 and, therefore, Anderson's arrest was lawfully effectuated. However, the defendants fail to develop any arguments demonstrating that a reasonable person would have believed, in light of the facts and circumstances within the knowledge of the arresting officers at the time of the arrest, that Anderson engaged in domestic abuse. Because their argument is so underdeveloped in this sense, it could be considered waived or at least forfeited. *See Spath v. Hayes Wheels Int'l-Ind. Inc.,* 211 F.3d 392, 397 (7th Cir. 2000). Forfeited or not, however, it is impossible to

conclude from the undisputed facts that the officers had probable cause to arrest Anderson based on a reasonable belief that she had committed domestic abuse. Indeed, the undisputed facts tend to show only that Wichmann was guilty of that offense, and that Anderson was merely the victim of domestic abuse.

Accordingly, for Anderson's arrest to have been effectuated lawfully, the police officers must have had probable cause to arrest her for some other crime. In this regard, the defendants argue that the officers had probable cause to arrest Anderson for disorderly conduct. Anderson has also conceded as much. In her response brief, Anderson states "the only probable cause that the officers had was probable cause to believe that Anderson and Wichmann had disturbed the peace . . . " and "[d]isorderly conduct could be charged." (Pl. Anderson Resp. Br. 17-18). Even without this concession by plaintiff, the court finds the underlying facts are not in dispute and they support the probable cause determination by the officers as to Anderson's disorderly conduct.

Wisconsin Statute § 947.01 provides: "[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of" disorderly conduct. The undisputed facts show that the officers, at the time of Anderson's arrest, knew a loud argument had occurred between Anderson and Wichmann. In fact, the argument was sufficiently loud that it prompted neighbors to report the disturbance by placing a 911 call.

When the officers found Anderson in the shower with Wichmann, it is reasonable for them to have assumed that perhaps she was not a victim of domestic abuse but simply a perpetrator of disorderly conduct. Thus, this court finds that there was sufficient evidence of Anderson's violation of the disorderly conduct statute for the officers to arrest her. Accordingly, the court finds that defendants are entitled to summary judgment as to plaintiffs' Fourth Amendment claims of unlawful entry and arrest.[8]

### C. Search of Anderson

Anderson claims she was subjected to an illegal search of her person. She contends that after she was taken into custody, it was obvious that she did not possess any weapons, contraband or anything else that could pose a danger to the officers' safety because she was handcuffed with her hands behind her back while she was naked. She further states that because the officers provided her with the clothes she dressed in, there was no need for Officer Petranech to search her again once she was fully clothed.

Typically, the scope of a search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). Additionally, "[w]hen an arrest is made, it is reasonable for the arresting

---

[8]Moreover, though it does not appear the plaintiffs challenge the constitutionality of the officers' initial search of the apartment, the court notes that the brief search conducted after entry was limited to determining if Wichmann was present as well as if Anderson was harmed or in need of assistance. The court finds that the ensuing search of the apartment was not in violation of the Fourth Amendment because it "was appropriately limited to the circumstances that justified it." *United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992).

officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762 (1969). The court recognizes there is some logical force to Anderson's argument in that it would appear that, at the time of the search, she was not in a position to either reach for a weapon or destroy evidence. However, though the authority to search a person incident to a lawful arrest is based upon the need to disarm or discover evidence, it does not necessarily follow that the authority depends upon "what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *United States v. Robinson*, 414 U.S. 218, 235 (1973). This is so because "[a] police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search." *Id.* Furthermore:

> A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*Id.* Therefore, though the circumstances of Anderson's arrest and the search of her person were unusual in that Anderson was found naked in the shower, handcuffed while naked, helped to dress by the officers, and then searched once she was fully dressed, this does not mean the search of her person was in violation of the Fourth

Amendment. Indeed, Anderson admits that she was allowed briefly out of her handcuffs to put on her top, then she was re-cuffed. The fact that Anderson was uncuffed momentarily may have been enough time for her to conceal a weapon of some sort. Therefore, the court finds that the search of Anderson was not unreasonable in light of the circumstances surrounding the search. The indignity of the arrest and the search, when viewed from Anderson's position, does not outlaw the search because it was reasonably related in scope to the circumstances which justified the interference in the first place.

### D. Use of Excessive Force

The plaintiffs both argue their arrests were unlawful because the force used to effectuate the arrests was excessive. Where an excessive force claim arises in the context of an arrest, it is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). As in other Fourth Amendment contexts, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Factors relevant to this inquiry include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. Additionally, *Graham* states that the reasonableness of use of force must not be judged "with the 20/20 vision of hindsight" but rather from the perspective of a

reasonable officer on the scene. *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Moreover, physical injury is not an element of an excessive force claim. *McAllister v. Price*, 615 F.3d 877, 882 (7th Cir. 2010). "Rather, it is evidence of the degree of force imposed and the reasonableness of that force." *Id.*

### 1. Anderson's Claim

Anderson contends that the officers' pointing of their guns at her constituted excessive force. She argues that the display of their handguns was objectively unreasonable because the officers believed that Anderson had been the victim of domestic abuse and, therefore, should have been rendering aid to Anderson, rather than leveling a gun at her and placing her in handcuffs. Alternatively, Anderson states that, at most, the officers only had probable cause to suspect her of the minor offense of disorderly conduct. As such, she contends the display of handguns was a disproportionate response. Anderson further avers that because she was naked, in the shower, it should have been obvious to the officers that she posed no threat to the officers' safety. She also argues she was not resisting arrest in any way.

First, the court notes that an absence of extensive physical contact or physical injury does not necessarily preclude a conclusion that a display of force was excessive, though such an absence can be an important indicator of the use of

excessive force. *See McNair v. Coffey*, 279 F.3d 463, 468-69 (7th Cir. 2002) (Cudahy, J., concurring). Therefore, the mere pointing of a handgun at a person, with no physical contact, could potentially rise to the level of an excessive show of force if found to be objectively unreasonable under the circumstances. The Seventh Circuit has typically found that gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment. *See, e.g., Baird v. Renbarger*, 576 F.3d 340, 345-47 (7th Cir. 2009) (Police officer's use of 9-millimeter submachine gun to detain detainees at search site for an alleged altered vehicle identification number – a nonviolent crime – was an objectively unreasonable use of force because there was never a reason to suspect a threat to the safety of the officers involved); *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000) (pointing a gun at an elderly man's head for ten minutes even after realizing that he is not the desired suspect and when he presents no resistance is "out of proportion to any danger that Jacobs could possibly have posed to the officers or any other member of the community"); *McDonald v. Haskins*, 966 F.2d 292, 294-95 (7th Cir. 1992) (pointing a gun at a nine-year-old child during a search and threatening to pull the trigger was "objectively unreasonable").

Though Anderson's deposition testimony of which officers pointed their weapons at her is ambiguous, the record suggests that both officers pointed their guns at Anderson. The relevant undisputed facts are as follows: both officers had their guns drawn when they made a sweep of the apartment. (Wellner Dep. 106:8-

12; Petranech Dep. 103:8-10). Officer Petranech arrived first at the bathroom after Wichmann alerted him to his presence in the shower. (Wichmann Dep. 68:5-7). Officer Petranech testified he had his weapon pointed at Wichmann until Wichmann was lying on the ground. (Petranech Dep. 114:22-24). He was about to re-holster the handgun when Anderson popped her head out from behind the shower curtain, alerting the officers to her presence. (Petranech Dep. 116:17-25). Anderson testified that her appearance seemed to surprise the officers. (Anderson Dep. 149:1-5). When the officers were alerted to her presence behind the shower curtain, Officer Petranech stepped back to a position of cover by the bathroom door, drew his weapon again and pointed it at Anderson. (Anderson Dep. 163:6-22; Petranech Dep.116:17-25). Officer Petranech then ordered Anderson to show her hands and to get out of the shower, all while still pointing the gun at her. (Petranech Dep. 116:25). She refused at first because she was naked, but eventually complied, holding a bath mat over her body to shield it from the officers' view. (Petranech Dep. 117:19-25; Anderson Dep. 164:1-12). After both Anderson and Wichmann were out of the shower, she sitting and he lying on his stomach, Petranech holstered his weapon again, and moved forward to handcuff Wichmann. (Petranech Dep. 121:10-19). At this time, plaintiff contends Officer Wellner pointed his gun at Anderson to cover for Officer Petranech. (Plaintiff's Additional Facts ¶ 92).

In applying the *Graham* standard to the undisputed facts of this case, the court concludes a rational jury could find the conduct of the officers was not objectively

reasonable. When the officers entered the apartment they were under the impression that Anderson was the victim of domestic violence and, alternatively, they only had probable cause to believe she had engaged in disorderly conduct for having a loud argument with her boyfriend. Thus, Officer Petranech only had reason to believe Anderson had committed a nonviolent crime resulting in no physical injuries. Next, the evidence does not demonstrate that Anderson posed a threat to the officers or any other individual. The officers were undoubtedly surprised by Anderson's presence in the bathroom, their view of Anderson was partially blocked by the shower curtain, and the officers were confronted with a small enclosed space, in which Wichmann still remained. However, the fact remains that Anderson was found naked in the shower – a particularly vulnerable position – especially when the officers had no reason to believe she was armed or dangerous in the first place. Furthermore, it does not appear that Anderson was resisting arrest or attempting to flee from the officers when they pointed their guns at her. Anderson did, at first, refuse to comply with Officer Petranech's orders to step out of the shower. Yet, it was not because she was resisting arrest, but rather because she was naked and reasonably concerned about exposing her naked body to the male officers. Though the evidence before the court is capable of many interpretations, the court still finds

that Anderson has come forward with evidence sufficient for a jury to conclude that Officer Petranech's use of force by pointing his weapon at her was excessive.[9]

### 2. Wichmann's Claim

Plaintiff Wichmann claims he was subjected to excessive force during the effectuation of his arrest based on: (1) being tightly handcuffed; (2) being subjected to a "takedown" maneuver; and (3) being dragged 8-10 feet outside the bathroom. His arguments are similar to Anderson's in that he contends the vulnerability of his situation – being naked in the shower, and the fact he was not resisting arrest and that the officers only had probable cause to arrest him for the relatively minor offense of disorderly conduct made the officers' conduct unreasonable under *Graham*.

Here, the court has already noted Wichmann was not simply suspected of disorderly conduct but was, instead, still under suspicion of committing domestic abuse. Domestic abuse typically involves violence or aggression. Therefore, the severity of the crime faced by the officers, on its own, could lead a reasonable law enforcement officer to perceive a threat of violence from Wichmann. That Wichmann was found naked in the shower, admittedly places him in less of a position to pose a threat to the officers. Furthermore, upon entering the apartment, neither officer observed any sign of a violent struggle (Petranech Dep. 87:23-25; Wellner Dep. 107-108) and there was no indication that Wichmann was armed because the officers

---

[9]The officers in this case have both asserted qualified immunity as an affirmative defense to all of the plaintiffs' claims. The court will take up whether the officers are entitled to qualified immunity as to Anderson's excessive force claim in the subsequent section.

had him show his hands from behind the shower curtain. (Petranech 91:1-2, 113:1-7; Wellner 213). The court recognizes that simply because Wichmann was not armed, does not mean the officers were unreasonable to assume the plaintiff posed no threat to them under the circumstances. Weapons could have been hidden somewhere in the bathroom or Wichmann could have become violent or aggressive. Additionally, like Anderson, Wichmann at first refused to step out of the shower because he was naked. (Petranech Dep. 117:19-25). Viewing the facts in a light most favorable to Wichmann, the court concludes that Wichmann's reluctance to step out of the shower was less about resisting arrest and more about the fact that he was naked.

The degree of force used is also possible of various interpretations. It is undisputed that Officer Petranech grabbed Wichmann from the shower and used a takedown maneuver to place Wichmann in a prone position (on his stomach) on the bathroom floor. Wichmann claims the takedown maneuver caused him to hit his head on the floor, leaving a bump. (Wichmann Dep. 70:16-23, 72:1-17, 82:2-5). It is also undisputed that Officer Petranech handcuffed Wichmann, placing some pressure on his arm and back in the process, and then dragged Wichmann from the bathroom to the kitchen – about 8 to 10 feet – from which the plaintiff received a tile burn on his hip. (Wichmann Dep. 81:19-25). Wichmann also complains that his wrist was injured because the handcuffs were put on him too tight. (*Id.*). Even if Officer Petranech was justified in using some force to effectuate the arrest, the court finds

that the trier of fact could find that using the force involved here against a non-resisting suspect who did not appear armed could have been unreasonable given the circumstances. Therefore, the court must deny the officers summary judgment as to the plaintiffs' excessive force claims unless they are entitled to qualified immunity.

### E. Qualified Immunity

Here, the officers assert that if the court is unable to conclude the officers did not violate the plaintiffs' constitutional rights, then the officers are entitled to qualified immunity for the plaintiffs' claims. Public officials performing discretionary functions are generally entitled to qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "They are accorded this ample protection not as a license to violate constitutional rights without recourse nor as an excuse to turn a blind eye to the requirements of the law, but to preserve the vigilance of those individuals vested with the obligation to protect the public interest in the face of ambiguity." *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001) (citing *Hunter v. Bryant*,

502 U.S. 224, 228-29 (1991) and *Malinowski v. DeLuca,* 177 F.3d 623, 626-27 (7th Cir.1999) (articulating policy reasons behind the immunity)).

When presented with a defense of qualified immunity, courts must: (1) determine whether the plaintiff has alleged the deprivation of an actual constitutional right; and (2) if so, determine whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194 (2001); *Layne*, 526 U.S. at 609; *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). The Supreme Court recently reconsidered *Saucier* and decided "that while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818 (2009). Therefore, district courts may exercise their discretion in deciding which of the two prongs to address first. *Id.* Although qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiff. *Spiegel*, 196 F.3d at 723; *Clash v. Beatty*, 77 F.3d 1045, 1047-48 (7th Cir. 1996).

The court has found that the officers' decision to conduct a warrantless search and seizure in the plaintiffs' home did not violate the Fourth Amendment because probable cause and exigent circumstances existed. Because the court has found that there was no constitutional violation in this regard, it is unnecessary to consider whether the officers are entitled to qualified immunity as to these claims. *See Kraushaar v. Flanigan,* 45 F.3d 1040, 1049 n. 4 (7th Cir. 1995) (citing *Cornfield v.*

*Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1328 (7th Cir. 1993) (Easterbrook, J., concurring)).

As to plaintiff Anderson's excessive force claim, the court has determined that a trier of fact could find that the officers' use of force was not objectively reasonable under the *Graham* factors. Even so, the court reasons qualified immunity should shield the officers in this instance because they could have concluded they had legitimate justification under the law for acting as they did. That is because the undisputed facts of this case fall within the "hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206. As such, it is precisely the type of case in which qualified immunity should be applied to protect the officers from liability.

To meet her burden of defeating the assertion of qualified immunity, the plaintiff cites *McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002), and argues her case is dissimilar. In *McNair*, motorists who were pulled over and arrested at gunpoint for not paying parking tickets sued the arresting officer for the use of excessive force. *Id.* The arresting officer had called for backup after spotting the plaintiffs' car because "it was dark, the neighborhood posed risks, and the [plaintiffs] did not immediately stop" when he turned on his cruiser's lights to pull them over. *McNair*, 279 F.3d at 465. When the plaintiffs finally stopped, they were surrounded by eight squad cars, told to get out with their hands up, and many officers leveled weapons at the plaintiffs. *Id.* Though a jury determined this use of force was unreasonable, the court dismissed the case against the arresting officer, finding the officer was

entitled to qualified immunity. *Id.* The court does not find plaintiff's reliance on this case entirely helpful in establishing that the constitutional right at issue was clearly established, as it is not sufficiently analogous. Though similar in that *McNair* involved the wielding of weapons, the arresting officer in that case was entitled to qualified immunity because the court found he reasonably called for backup and could not predict nor control the number of squad cars that would respond or the number of weapons that would be displayed. *Id.* The issue before this court is whether the officers' use of weapons themselves was clearly unreasonable under the circumstances, not whether they were responsible for an excessive use of force by others.

The court previously discussed Seventh Circuit case law holding that guns pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment. *See Baird v. Renbarger*, 576 F.3d at 345-47; *Jacobs v. City of Chicago*, 215 F.3d at 773-74; *McDonald v. Haskins*, 966 F.2d at 294-95. However, the aforementioned cases all present extreme situations in which the officers in question obviously overstepped the bounds of reasonableness. The circumstances in this case are not so egregious as holding a gun to a nine-year-old's head and threatening to pull the trigger though he is not a suspect, or using a sub-machine gun to detain individuals suspected of altering a vehicle identification number, or holding a gun to an elderly man's head for ten minutes after confirming he was not a suspect. *See Baird v. Renbarger*, 576 F.3d at 345-47; *Jacobs v. City of Chicago*,

215 F.3d at 773-74; *McDonald v. Haskins*, 966 F.2d at 294-95.  Therefore, even with the belief that Anderson posed no threat to the officers, the officers would have been reasonable in assuming the law permitted them to point their weapons at Anderson under the facts of this case.

Here, while it is true the officers entered the apartment with the belief that Anderson was a victim of domestic violence and not a perpetrator of a crime – other than disorderly conduct – the situation faced by the officers in the bathroom while effectuating the plaintiffs' arrests, evolved quickly.   First, Officer Petranech's initial pointing of his gun at Anderson was out of surprise at her presence in the bathroom.  Officer Petranech kept his gun positioned on Anderson only until she exited the shower. Officer Wellner only pointed his gun at Anderson until Officer Petranech handcuffed Wichmann, who remained unsecured in the bathroom.   Therefore, though Anderson herself may not have posed a substantial threat, an officer in these circumstances could reasonably have believed the pointing of his weapon at Anderson was lawful because the other individual – who did pose more of a threat – remained in the bathroom and unsecured.

Furthermore, the cases in which the Seventh Circuit has found the display of a weapon to be unreasonable typically involved verbal threats or shocking use of the weapon.  In this case, the officers did not verbally threaten Anderson or hold the gun to her head.  Furthermore, the police officers in this case were making an arrest and, therefore, they were entitled to use some degree of force in carrying out their duties.

*Graham,* 490 U.S. at 396. Accordingly, not only has plaintiff failed to satisfy her burden of defeating the officers' assertions of qualified immunity as to her excessive force claim, but the court's independent review of analogous case law reveals that the officers' use of their weapons under these circumstances was neither patently violative of Anderson's Fourth Amendment rights nor contrary to clearly established law.

The same holds true for the use of force against Wichmann. Though the court previously determined, based on the undisputed facts, that a reasonable jury could find that Officer Petranech's use of force was excessive, Officer Petranech is entitled to qualified immunity as to that claim because the court cannot conclude that only a "plainly incompetent" policeman, *see Malley v. Briggs*, 475 U.S. at 341, could have thought the use of force was permissible at the time.

Plaintiff argues the case at hand is analogous to *Holmes v. Village Of Hoffman Estates*, 511 F.3d 673 (7th Cir. 2007), in which the court held an officer was not entitled to qualified immunity when he slammed the plaintiff's head against a car, whispered in plaintiff's ear he was going to hurt the plaintiff, executed a wristlock on plaintiff – a move used to subdue uncooperative individuals, and pressed his knee against the plaintiff's face, even though plaintiff did not physically resist the officer and complied with all the officer's requests. Though Wichmann did not physically resist the officers, it is undisputed that he initially failed to comply with Officer Petranech's order to step out of the shower. This failure to comply precipitated

Officer Petranech's use of the takedown maneuver. Accordingly, the facts of this case are in contrast to *Holmes* where the plaintiff alleged he was entirely cooperative. Furthermore, the plaintiff has failed to convince the court that Officer Petranech's dragging of Wichmann was contrary to clearly established law. When Officer Petranech dragged Wichmann out of the bathroom while he was handcuffed, it was not necessarily a wholly gratuitous use of force. Anderson was still in the small bathroom at this point and it is not unthinkable that Officer Petranech would want to get Wichmann out of the bathroom as soon as possible so as to attend to Anderson. Plaintiff neglects to address these additional relevant facts in his comparison of his case with that of *Holmes*. Therefore, even if Officer Petranech's conduct is categorized as unreasonable, the court concludes that it was reasonable for him to assume his actions were permissible under the law.

Furthermore, Wichmann compares the facts of this case with *Clash v. Beatty*, 77 F.3d 1045 (7th Cir. 1996). In *Clash*, an officer allegedly propelled the plaintiff into a car with a push, despite the plaintiff's purported lack of resistance. *Id.* at 1048. The district court denied summary judgment because it could not conclude that the shove was reasonable as a matter of law in light of the minimal degree of harm posed by plaintiff at the time, and also because it determined that the facts might indeed show that the shove was "wholly gratuitous." *Id.* The court's denial of summary judgment indicated that the question of whether the qualified immunity defense was even available to the officer required further factual development. *Id.*

As such, the case is less useful to the court in determining whether the plaintiff has shown the existence of the allegedly clearly established constitutional right. Here, further factual development is not necessary to determine whether qualified immunity is available as a defense. The issue for this court is simply whether the officer's conduct, under the undisputed facts of this case, was contrary to clearly established law. Under the circumstances faced by Officer Petranech, the court cannot conclude that only a "plainly incompetent" law enforcement official could have thought the takedown maneuver, the pressure being applied while handcuffing plaintiff, and the dragging of the plaintiff eight to ten feet was permissible. Therefore, the officers are both entitled to qualified immunity as to the plaintiffs' excessive force claims, and the court is obliged to grant the defendants' motion for summary judgment in its entirety.

Accordingly,

**IT IS ORDERED** that plaintiffs' motion for leave to amend the summons and complaint (Docket #'s 36, 38) be and the same is hereby **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Docket #18) be and the same is hereby **GRANTED** as to all of plaintiffs' claims;

**IT IS FURTHER ORDERED** that plaintiff Anderson's motion to enlarge time to name expert witnesses and provide expert report (Docket #17) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that defendants' motion to enlarge time to file exhibits and corrected brief (Docket #22) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on its merits together with costs as taxed by the clerk of the court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of February, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge